```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
```

```
_____
                                   )
KIMBERLY QUINTAL,                  )
                                   )
                Plaintiff,         )
                                   )       Civil Action
v.                                 )       No. 23-10692-PBS
                                   )
DEPARTMENT OF DEVELOPMENTAL        )
SERVICES and EXECUTIVE OFFICE OF   )
HEALTH & HUMAN SERVICES,           )
                                   )
                Defendants.        )
_____)
```

**MEMORANDUM & ORDER**

January 3, 2025

Saris, D.J.

**INTRODUCTION**

Kimberly Quintal alleges that her former employer, the Massachusetts Department of Developmental Services ("DDS") within the Executive Office of Health and Human Services ("EOHHS"), discriminated against her because of her religion by failing to accommodate her request for a religious exemption to its Vaccination Verification Policy and terminating her employment for refusing to take the COVID-19 vaccine. She asserts a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) seeking damages, attorney's fees, and reinstatement (Dkt. 1 at 22). DDS and EOHHS ("Defendants") now move for summary judgment (Dkt. 21).

1

After hearing, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 21).

**FACTUAL BACKGROUND**

The following facts are drawn from Defendants' Statement of Undisputed Material Facts (Dkt. 23). Quintal did not dispute any of the facts.

I.  **Quintal's Employment with DDS**

In the fall of 2021, Quintal was employed as a Program Monitor out of the Plymouth Area Office of DDS. DDS is the Massachusetts agency responsible for delivering specialized services and support programs for adults and children with intellectual and developmental disabilities. As a Program Monitor, Quintal was required to work in area offices to monitor the wellbeing of DDS residents. Quintal worked as a hybrid employee, spending at a minimum two days a week in the central office with around five other people. She was responsible for interviewing and gathering information through in-person, onsite visits to DDS congregate care settings to determine the extent and the validity of alleged non-compliance with DDS regulations and policies. Onsite visits involved interviewing residents and staff in congregate care homes with about three to four residents and three to four staff members who provide round-the-clock care.

II. **The Executive Order**

On August 19, 2021, Governor Baker issued Executive Order 595 ("EO 595"). EO 595 highlighted the importance of the COVID-19 vaccine and ordered all executive department employees to show that they received the COVID-19 vaccination by October 17, 2021. EO 595 also required state agencies to implement "a procedure to allow limited exemptions from the vaccination requirement where a reasonable accommodation can be reached for any employee who is unable to receive COVID-19 vaccination due to medical disability or . . . a sincerely held religious belief." Dkt. 23-2 at 3-4. In compliance with Governor Baker's order, the Human Resources Division for the Executive Branch issued a Vaccination Verification Policy for all executive agencies (including DDS).

On September 17, 2021, using an exemption request form, Quintal requested an exemption based on her religious views. Quintal stated in part:

> I seek God's will in all areas of my life through prayer and the discernment He bestows upon me. I had Covid and recovered due to the healthy immune system God has given me. I am protected from getting Covid due to this natural immunity and my reliance upon God's protection. I have prayed and asked God whether I should get the Covid shot and I have received a clear word from the Lord that I must not get the shot.

Dkt. 23-6 at 2.

To review Quintal's exemption request EOHHS Labor Relations Coordinator considered Quintal's job description and work

3

location, spoke to Quintal's manager and discussed with Quintal her religious beliefs. In this discussion Quintal requested that she be permitted to perform her in-person work duties wearing personal protective equipment ("PPE") and social distancing and that she be tested periodically for the virus. Following the assessment, both EOHHS and DDS determined that granting a vaccination exemption to Quintal would pose an undue hardship and that there were no alternative accommodations that would allow Quintal to perform the essential functions of her job. As a result, DDS terminated Quintal on December 2, 2021.

### III. COVID-19

COVID-19 is the disease caused by the SARS-CoV-2 virus. It is infectious and contagious and can cause hospitalization and death. By the time Governor Baker issued EO 595 on August 19, 2021, there had been approximately 18,000 deaths from COVID-19 in Massachusetts. By January 11, 2022, the Massachusetts Department of Public Health confirmed 20,275 deaths due to COVID-19. Dkt. 23-1 ¶ 13. COVID-19 is and was considered to be a vaccine preventable disease, with widespread vaccination as the most effective method of limiting the spread of COVID-19. Id. ¶¶ 14-15.

As of the fall of 2021, "experts did not know or understand the full implications and/or consequences of infection by COVID-19." Id. ¶ 12. In the fall of 2021, a COVID-19 outbreak would have curtailed normal operations at DDS facilities, created an extra

4

burden of caring for ill residents, and caused a reduction in staff availability. Dkt. 23 ¶ 44. During that time, staff absences due to sickness caused DDS to temporarily shut down or combine programs and to use forced overtime to ensure staffing levels. Id. ¶ 45.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court must view the record in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor. See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

## DISCUSSION

### I. Title VII Standard

Title VII prohibits employers from "discriminat[ing] against any individual . . . because of [her] . . . religion." 42 U.S.C. § 2000e-2(a)(1). "[T]he First Circuit applies a two-part framework to religious discrimination claims under Title VII. First, [Quintal] must make her prima facie case that a bona fide religious

5

practice conflicts with an employment requirement and was the reason for the adverse employment action." Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004). "In order to establish a prima facie case of religious discrimination based on a failure to accommodate, [Quintal] must show that '(1) a bona fide religious practice conflicts with an employment requirement, (2) . . . she brought the practice to the [employer's] attention, and (3) the religious practice was the basis for the adverse employment decision.'" EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (quoting EEOC v. United Parcel Serv., 94 F.3d 314, 317 (7th Cir. 1996)). Second, "if [Quintal] establishes her prima facie case, the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." Cloutier, 390 F.3d at 133.

## II. Prima Facie Case of Religious Discrimination

Defendants argue that Quintal fails to establish a prima facie case of religious discrimination because Quintal's "stated reasons for her objection to the COVID-19 vaccine focuse[d] on medical, health, and lifestyle reasons, which are personal and not religious." Dkt. 22 at 8. However, Quintal asserts that "as a Christian she had prayed and sought discernment about the COVID-19 vaccine, and relied on God's protection and her healthy immune

6

system." Dkt. 27 at 2. Religious beliefs protected by Title VII do not need to be "acceptable, logical, consistent, or comprehensible." Unión Independiente, 279 F.3d at 56 (quoting Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 714 (1981)).

Defendants' argument that Quintal's objection to the COVID-19 vaccination is "personal and not religious" is not persuasive. "[J]udicial inquiry into the sincerity of a person's religious belief 'must be handled with a light touch, or judicial shyness.'" Davis v. Fort Bend County, 765 F.3d 480, 486 (5th Cir. 2014) (quoting Tagore v. United States, 735 F.3d 324, 328 (5th Cir. 2013)). A court "must refuse to dissect religious tenets just 'because the believer['s] . . . beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.'" A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist., 611 F.3d 248, 261 (5th Cir. 2010) (quoting Thomas, 450 U.S. at 715). Quintal stated that she "received a clear word from the Lord that I must not get the shot." Dkt. 23-6 at 2. Whether Quintal's belief is a true religious tenet is "not open to question." Davis, 765 F.3d at 485 (quoting Moussazadeh v. Tex. Dep't of Crim. Just., 703 F.3d 781, 790 (5th Cir. 2012)). Her exemption request was couched in strong language regarding her belief in God and her religious following.

Drawing all reasonable inferences in Quintal's favor, the Court concludes that a jury could find that Quintal's refusal to get a vaccine was based on a sincere religious belief and that Defendants were aware of this belief.

### III. Undue Burden

The burden now shifts to Defendants to show that they offered Quintal a reasonable accommodation or that providing such accommodation would have resulted in undue hardship for the agency. See Unión Independiente, 279 F.3d at 55. Here, it is undisputed that Defendants did not offer Quintal any accommodation (Dkt. 23 ¶ 71), so the analysis focuses on whether accommodating Quintal's vaccine exemption request would impose an undue hardship.

A successful undue hardship defense requires the employer to show that "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Groff v. DeJoy, 600 U.S. 447, 470 (2023). Undue hardship considerations "include not only direct economic costs, but indirect ones related to health and safety." Together Emps. v. Mass Gen. Brigham Inc., 573 F. Supp. 3d 412, 435 (D. Mass. 2021), aff'd, 32 F.4th 82 (1st Cir. 2022). In evaluating whether an employer has established an undue hardship, courts consider "the context of the particular employer's business," "the nature of operations," "direct economic costs," and "indirect costs" such as health or safety. Antredu v. Mass. Dep't of Youth Servs., 729

8

F. Supp. 3d 76, 84 (D. Mass. 2024) (quoting Together Emps., 573 F. Supp. 3d at 435).

In similar circumstances, numerous courts have held that providing a vaccine exemption would create undue hardship. Does 1-6 v. Mills, 16 F.4th 20, 36 (1st Cir. 2021)(holding "hospitals need not provide [a COVID-19 vaccination] exemption . . . because doing so would cause them to suffer undue hardship"); Antredu, 729 F. Supp. 3d at 84 (holding that a Group Worker's request to remain unvaccinated would pose an undue hardship to the Massachusetts Department of Youth Services due to the Group Workers' close contact with colleagues and clients and essential job function of restraining youth); Isaac v. Exec. Off. of Health & Hum. Servs., No. 22-11745-RGS, 2023 WL 8544987, at *2-3 (D. Mass. Dec. 11, 2023), appeal dismissed, No. 23-2065 (1st Cir. Feb. 22, 2024); Haley v. Exec. Off. of Health & Hum. Servs., No. 23-11691-RGS, 2024 WL 1836480, at *1-2 (D. Mass. Apr. 26, 2024), appeal docketed, No. 24-1450 (1st Cir. May 15, 2024); see also Howe v. Mass. Dep't of Corr., No. 4:22-cv-40119-MRG, 2024 WL 3536830, at *7 (D. Mass. July 25, 2024) (stating that lawsuits are "not the forum to retroactively litigate the decisions of public, democratically-elected officials who acted based on guidance from scientific experts to deal with an unprecedented emergency situation").

As an accommodation, Quintal requested that DDS permit her to perform her in-person work duties wearing PPE and social distancing

and to be tested periodically for the virus in lieu of getting vaccinated for COVID-19. Dkt. 23 ¶ 66. Because visiting congregate care homes requires close social interaction, Defendants assert that absent vaccination, Quintal would pose "an unsafe risk of transmission of COVID into the vulnerable resident and staff population." Dkt. 23 ¶ 71.

To meet the burden of establishing undue hardship, Defendants rely on the affidavit of Lawrence Madoff, MD, the Medical Director of the Massachusetts Department of Public Health's Bureau of Infectious Disease and Laboratory Sciences. Dr. Madoff states that "[t]he most effective method for preventing the spread of COVID-19 was (and is) widespread vaccination of a given population." Dkt. 23-1 ¶ 15. Additionally, Dr. Madoff asserts that "[u]nvaccinated individuals are (and have always been) at much higher risk of infection, serious illness, and death, and therefore at much higher risk of transmitting COVID-19." Id. ¶ 20. Admitting that vaccinated individuals may still get sick, Dr. Madoff points out that breakthrough cases are generally less severe for vaccinated individuals. Id. ¶ 22. Dr. Madoff goes on to explicitly state that "without vaccinations, residents and staff at EOHHS and DDS, as well as members of the public, would be at significantly greater risk of contracting COVID-19." Id. ¶ 28.

In opposition, Quintal challenges the assertion that COVID-19 vaccines are effective in preventing infection and transmission

10

of COVID-19. Dkt. 27 at 11. Quintal does not submit any expert evidence. Instead, she relies on Dr. Madoff's deposition testimony where he was asked if it is true that "if a person becomes fully vaccinated against COVID-19[,] that person can still contract COVID-19." Dkt. 27-1 at 30. Dr. Madoff not only asserted during this deposition that a person can still contract COVID-19 if vaccinated, but in a coauthored paper, he stated that "transmission to and from vaccinated individuals is common in some settings." Dkt. 27 at 9. Furthermore, Dr. Madoff stated that he did not know the risk of a fully vaccinated person contracting COVID-19 and that that question "is answered at the population level" only. Dkt. 27-1 at 23.

While it is true that vaccinated individuals can still contract and transmit COVID-19, the undisputed expert testimony is that vaccinated individuals are still better protected against serious illness or death. Dkt. 23-1 ¶ 19. Defendants present a persuasive argument that lessening the risk of serious illness or death from the COVID-19 disease reduces the operational impact on both EOHHS and DDS. Id. ¶ 22. At the time of Quintal's termination, DDS suffered from staffing shortages, caused by employees who contracted the COVID-19 infection.

Taking into account the increased staffing shortages, the vulnerable population Quintal and her colleagues worked with, and the severity of the COVID-19 illness for unvaccinated people at

11

the time, Defendants have met their burden of showing that allowing Quintal's vaccination exemption would impose an undue hardship on the agency.

## **ORDER**

For the foregoing reasons, the Court **ALLOWS** Defendants' motion for summary judgment (Dkt. 21).


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge